We're going to call Brigham v. Frontier, 21-1335, and our first argument for the appellant will be via Zoom, Mr. Crum. Good morning, your honors, and may it please this court, my name is John Crum, and I represent the appellant, Rebecca Brigham. Thank you for allowing me to appear via Zoom. I'm in Alaska at the moment, and as it turns out, I am battling a pretty bad flu or cold so you probably didn't want me in the room anyway. And so I've also been told that there may be a slight delay on the audio on my end, so I'm going to try to take appropriate pauses, feel free to yell at me if needed. So this case is a summary judgment case, where Ms. Brigham's case was dismissed for failing to meet her prime official elements. I think that's really critical to keep in the background of the briefing and the argument is to recall that the trial court held that Ms. Brigham failed to meet her prima facie elements, which were described in the cases as not onerous. Another red flag waving in the background of this case is the fact that the EEOC gave Ms. Brigham a positive probable cause finding when she filed her complaint with the agency and the agency investigated her complaint. And so it isn't that a probable cause finding by the EEOC somehow immunizes a plaintiff's case from summary judgment, it's simply that the EEOC is the federal agency charged with administering and enforcing the ADA, among other laws, but the ADA is relevant here. And therefore the EEOC's finding in this regard should be given some amount of deference. Any subsequent form and decision maker, including this one, I think ought to give the EEOC's decision some amount of deference. So the thrust of Ms. Brigham's case is a failure to accommodate case. So Ms. Brigham is alleging that she was disabled within the meaning of the ADA, she needed a reasonable accommodation, she requested a variety of reasonable accommodations and Frontier failed to provide her with a reasonable accommodation and Frontier likewise failed to identify any sort of undue burden or expense that would prevent Frontier from having to provide a reasonable accommodation. But again, the trial court stopped short at getting to the undue burden portion of the analysis. The trial court simply said, with regard to Ms. Brigham's claims for failure to accommodate that, you failed to assert a plausibly reasonable accommodation. And so the first accommodation that Ms. Brigham sought was she requested to be transferred to the general office, what Frontier calls the GO, for light duty work. And what we know about light duty work at the GO is that Frontier maintains a light duty program for workers injured on the job. And if a worker is injured on the job, they are able to be transferred to the GO to perform light duty work as an accommodation. And the collective bargaining agreement between Frontier management and its employees provides for what they call the OJI program, the On the Job Injury Program. Counsel, assuming for the moment that the collective bargaining agreement does provide for this type of transfer to an open position in the GO, what does Duvall mean for your case? It seems to me that we were pretty specific there, that even if positions like this are open, technically open, if they're not open to non-disabled employees, essentially the same way they would be open to your client, and they're not here, they're only open to injured flight attendants, isn't that correct? I mean, basically we held that it's not technically a vacant position if it's not being held open to other non-disabled employees in Duvall. Does that make sense? It does make sense. I understand the question. I think the answer here is that Duvall stands for the proposition that an employer need not create a position as a reasonable accommodation. And here, it isn't that Ms. Brigham asked Frontier to create a light duty position. These positions exist. They're held open via the terms of the collective bargaining agreement. There are a theoretically infinite number of light duty positions held open by the collective bargaining agreement, and there is no restriction within the CBA whatsoever that says Frontier cannot offer one of these positions as a reasonable accommodation. Well, that's not my question. I'm presuming that the collective bargaining agreement would allow it. I think that's disputed, but let's presume it does allow it. I'm asking about Duvall. Duvall said more than what you're giving it credit for. I think Duvall, that was a situation where an employee was trying to be reassigned to positions that were only being held for certain non-contract employees or contract employees, sort of the same thing. They were open, but only for a limited group, which is what we have here, too. They're open, but only for a limited group of injured flight attendants. And Duvall basically said, that's not really a vacant position. You don't have the obligation to open a position or create a position, but that's not a vacant position, because it's designated for a particular group. And other non-disabled employees are not able to apply for or seek that job either. It seems to me that that's analogous to our facts here. And I'm asking, why doesn't that aspect of Duvall control? Well, I think that's the critical distinction, is whether the positions are indeed vacant and open. And I think that a review of the cases beyond Duvall and the EEOC guidance makes clear that when an employer has an OJI program and they offer positions to injured workers, that the position is not due in position to somebody under the ADA. I agree that the EEO guidance indicates, as you're saying, that in this scenario, it seemed that they would need to open the position for her. But the EEO guidance isn't controlling on us. Duvall is. And so that's why I'm pushing you on Duvall. I don't think we have the capacity as a panel to just disagree with it, whether we do or not. And I'm going to supplement Judge Morris's question a little bit by focusing you on the language in Duvall that talks about similarly situated non-disabled employees. And that the similarly situated is the issue. I think that, again, I think that the question presented in Duvall is slightly different because there was an issue about whether those positions were actually vacant, actually open. And whether, in other words, whether the position was available or a position needed to be created effectively. And so I'm happy to reserve some time and rebuttal and think about this question and try to provide a better response. Or, sorry, a more thorough response to your question. I need to review the brief on that issue. Because in my mind right now, I thought that was the distinguishing factor in Duvall. Maybe we could switch then to the open time accommodation argument. You want to address that next? I would. Thank you, Your Honor. So the open time, it's important to understand that the collective bargaining agreement contains a process by which flight attendants bid on a line or a schedule to work. And the first round of bidding is seniority based. And so more senior flight attendants are able to bid first in line on the schedule that they would like, the flights that they would like to work. After that first round of seniority bidding is over, the flights that nobody picked go into a pool of first-come, first-served open time. Let me ask you, Mr. Perron, about that. So what you're asking is to bypass the first stage, the necessity to bid, and that she can craft all of her time through open time. So when I was studying your briefs, it occurred to me that I'm not really sure practically speaking is for her bypassing the original bidding process and crafting all of her time through open time with one exception. Because she obviously can substitute every single flight that she had bid on through open time, the equivalent of what you're proposing. The catch is that by bidding, by the first stage, by bidding on flights, she would be required to retain 45 hours. And I never saw anything in your proposal that if she were to craft all of her time to avoid lengthy layovers and overnight stays, that she would be required to accumulate 45 hours. If she did, then I don't understand why there would be any practical difference, any practical benefit to her by doing what Frontier had proposed. Well, I'm not sure that Frontier proposed an alternative to her request to bid to create her schedule out of open time. Her request was simply to say, hey, look, I'll take the leftovers. It was part of that process that she would say, I'll take the leftovers, but I will make sure, I will guarantee that I will have 45 hours just like every other flight attended. I didn't see that in your proposal. But was that part of the proposal? I think it was implicit in the proposal. The problem is the parties never got that far in the interactive process. So Frontier never said, hey, I get it. That makes sense. There's no seniority concerns of building a schedule from open time, but you're going to need to maintain 45 hours, or perhaps we would grant that slight deviation from that requirement and that would be fine. What's the difference between what you proposed and her saying, okay, well, I'm going to bid on a bunch of flights and I'm really not going to take too much time worrying about it because I'm going to go substitute every single one of those when I get to the open time process, just like I would have been able to do under my own proposal without Frontier's accommodation. And she's going to substitute all of her preferred flights anyway. So how does she benefit? Well, the benefit is there's no guarantee that there will be all of the flights needed in open time in order to create a full schedule. So the benefit is that Frontier would need to understand that she's going to pick from open time to which nobody, no other flight attendant has a seniority-based preference for and whether or not there are enough flights is another issue. Now, like I stated before, we never got, or excuse me, Ms. Brigham never got that far with Frontier in the interactive process. So as I understand it, your answer is the benefit to her is if she builds from open time, she can limit herself to fly only the trips that she can get in open time that don't require a layover, even if it's below the typical minimum. Well, I think that would be the logical next part of the discussion that never occurred, yes. But if it doesn't have that component, it doesn't make any difference to her, right? I mean, Judge Bachrach is correct that if she can just drop everything and pick open time anyway during the normal bidding process, she has the advantage of using her seniority to get the preferred trips, and the ones where she doesn't get her preference, she can drop them and pick up from open time. So as I understand it, the benefit here is if she can't get enough trips that don't require a layover, she'll just work fewer hours. Well, I think that's the problem, is Frontier wasn't willing to allow that. Well, is that what you're asking for? We're trying to understand what are the particulars of the accommodation she is requesting, because in order to determine whether it's reasonable, we need to understand it. And it didn't make any sense the way it was briefed for the same reasons Judge Bachrach just said. And so if what the key is to make this beneficial to her is that she essentially gets to work part-time, we need to understand that. Well, again, I think that that's shifting the burden to Ms. Burgum to have been fully responsible for the interactive process. She proposed a plausibly reasonable accommodation. Well, to sue them for failure to accommodate one of the elements of your claim is that you proposed a reasonable accommodation and they rejected it. So we're trying to understand whether you proposed a reasonable accommodation. So the burden is yours at this stage. I understand that, Your Honor. My point is simply that I think the logical next steps in order to flesh out the reasonable accommodation were needed to occur between the employer and the employee. I see that I'm out of time and I'm happy to address further if Your Honors would like the question, but I am certainly out of time. Well, you sure finished answering Judge McHugh's... I mean, I wouldn't want you to bring up another subject, but you're certainly welcome to finish answering Judge McHugh's question. Yeah, and so I think that the answer to the question is Ms. Burgum proposed a variety of plausibly reasonable accommodations. When that occurred, it was incumbent upon Frontier to engage in the interactive process to try to flesh out what a reasonable accommodation could be and whether or not one was possible, whether or not there would be an undue burden, et cetera. That's what should have occurred. And here, what Ms. Burgum can state is, I proposed a plausibly reasonable accommodation in transferring to the GO. I proposed a reasonable accommodation in altering how I build my schedule so I can try to avoid situations that would violate my treatment plan, a treatment plan that was required by Frontier, by the way. And I think what I'm hearing from Your Honors is we wish we could understand some additional contours of that request and what that meant practically in terms of how it would be implemented. Unfortunately, Frontier took breaks on the process at that point. Frontier said, no, that's it, and we're not gonna do it. And that's why we're here today. Well, we need to understand the contours of the requested accommodation for two reasons. One, to determine if it's reasonable. And two, to see if it violates the collective bargaining agreement by having a prejudicial impact on the seniority system. And so that's why it's important for us to understand precisely what it was that she was requesting. And in the briefing, it didn't make a lot of sense to me because I couldn't figure out what difference it made. So that's why, I mean, if you can help with that, this is your opportunity to do it. Yeah, I'm attempting to. I think that with regard to the transfer to the GO, I think that issue appears, understood in terms of what's that reasonable accommodation in terms of building a schedule out of open time. If Frontier had said, had taken the position, look, you're allowed to do that. You can do that under the collective bargaining agreement. That's fine. Go forth. Then they would have necessarily had to address the fact that there might not be enough flights in open time to create the full minimum 45 hours. And again, we didn't get there. But that's what Ms. Brigham was asking to do. Alright, thank you very much. We've gone a little over time, but you wanted to more fully answer the question I think about that was posed to you about the general office. So I'm going to give you 45 seconds in rebuttal, but I would like you to focus in your rebuttal on what you had intended to elaborate on in your rebuttal. So we'll hear from the ability. Good morning, your honors. My name is David Gartenberg. I am counsel for Frontier Airlines. Am I a good volume for everybody? Can you hear Mr. Crone? Can you hear? I can, thank you. I want to focus my argument on essentially the exact same things that we just talked about with Mr. Crone, which is the reasonableness of the proposed accommodations by Ms. Brigham. And I'll focus on the open time concept first because I think that I can clarify what the proposed accommodation was and also why it was proposed. Frontier's understanding of what Ms. Brigham was proposing is that she skips the bidding process, which is based on seniority, and then in open time she wouldn't be part-time as Judge McHugh had referenced, that she would build up a full schedule of at least 60 hours, that she would still adhere to the 60-hour minimum, which is contracted for in the CBA. But the reason that that is unreasonable is because all judges who, in the first instance, bid a schedule and have a schedule set of at least 60 credit hours. This is where I can't understand why you care. If she gives up her seniority position in the first bidding round and then she actually has no negative impact on the people above her in the line, and she actually benefits the people below her in the line, and then everybody goes into open time and it's a first come first serve, so seniority is irrelevant. How is there a direct negative impact on seniority for her to, as she says, get out of the line and just make her schedule from open time? So, two reasons. First of all, it's not the case that the open time flights are necessarily the dregs of the schedule. They're just, everybody has their own preferences about what they want to pick and what they don't want to pick. But it's first come first serve. It's first come first serve, but with an additional qualification, which is that in the open time process, nobody can drop below 45 hours from what their set schedule is. So it's not the case that any flight attendant could just say, wow, I got a really bad schedule. I'm going to drop it all and pick up everything from open time. You can never drop below 45 hours, so it needs to be piece by piece. What she is saying is exactly the second example that I gave, that she would start from scratch and build everything all at once, and necessarily then she would be picking up flights in the first instance that everybody else wouldn't be able to because they could only drop down piece by piece down to 45 and then back up to 60 and down to 45 and up to 60. I'm going to give an example. But all of that is being done not based on seniority. It's not based on seniority. It's not exactly the seniority benefits that are being infringed upon, although she is getting a right that more senior employees wouldn't have. But what she's doing is undermining the entire process for how scheduling is set at Frontier, which is collectively bargained for. Let's say we've got a card game. Everybody has dealt seven cards at the beginning. That's the bidding process. And then the rules are that you can discard one card and pick up one card. That's the open time process. You can't discard all of your cards and start from scratch. You have to go one by one. What she is saying, and I tried this on my five-year-old last night who agreed that this is unfair, is that you can't just start in the middle of the game and pick up a whole set of seven cards. That is unfair and he was grossly offended by the idea. That's where I disagree with your five-year-old. laughter So if these people the bidders are not being distributed seven cards. They are given the 52 cards and they're picking out of that open deck the ace of spades, the ace of clubs. They are bidding. They are taking the seven cards that they ideally prefer. And then they say that you say, well if I get 60 then I can substitute out of open time. But they are getting their ideal selections. They are not being randomly distributed these 60 hours of flights. So that's why I don't really understand fully the answer to Judge McHugh's question because under her proposal she is saying I'm going to bypass the opportunity to select my seven cards out of the open deck. What I'm saying is I'm going to let everybody else pick whatever cards they want and then I am going to go and I'm going to undergo the exact same minimum. I'm going to make sure that I get 45 hours. I'm going to make sure that the dregs of that deck accumulate to 45 hours of flights. So I do not understand although she is bypassing the collective bargaining agreement It seems to me that Judge McHugh is right. She is still not certainly not interfering with anybody with greater seniority and she is helping those with lesser seniority because she is letting those people pick out of the deck. And what I would say in response is that it's not the seniority rights directly that are being impeded. It's the entire scheduling system writ large. And it's the 45 hours. I'm sorry. Under our case of Dilley versus SuperValue it has to be a direct violation of the seniority system. It's not good enough that it interferes with your scheme. It's got to directly impact more senior people to their detriment. And I don't see it here. Well I think that what the Supreme Court in U.S. Airways versus Barnett spoke about is the principle of undermining a seniority system or a scheduling system writ large. The language of Barnett doesn't talk about a direct one-to-one bumping, although that certainly would infringe upon such rights. It talks about employees having an expectation of consistent and uniform treatment and a rule that substitutes a complex case-specific accommodation in violation of that system is invalid. Now I can conceptualize things that do not comply perfectly with a CBA that would be reasonable. Let's say for example we had the bidding process is supposed to close on the first Friday of every month and somebody can't work on Friday. So they ask for an accommodation and they say I want to bid on Thursday instead of Friday. That's fine. Nobody's rights are being impeded. They're not getting ahead in line. Their bid would still be considered as everybody else under the seniority system. That's an accommodation that doesn't undermine the integrity of the system writ large. But I would still say that allowing her to build up 60 hours from scratch puts her ahead of the other similarly situated flight attendants who are not able to ever build 60 hours from scratch in open time. Using the analogy we've had before, if all of the aces and the kings and queens and the jacks have already been taken out of the deck and she's building hers without any face cards, how is, I mean, it leaves more kings, queens, jacks and aces for the people below her in the seniority system. Because the whole purpose of the seniority system and the bidding system is to take out anybody else's judgment for what is a king and queen and jack. What are the ideal cards? There could be other people who are bidding who would love to not fly or would love to fly nights. Like there's nothing that says that they necessarily wouldn't want these flights and these are the last picks. They're just saying that there are open flights available and she is going to pick more open flights in the first instance than anybody else. And that is going to impede on other people's rights. Can I ask you to think about it from a different angle? I thought I saw something in the record, maybe it was in your briefs that there was some testimony that this would actually be something, if you allowed her to do it, that this would actually be something that other flight attendants would like to do. That they would like to bypass the bidding system. Is this an advantage? To me it doesn't seem like it would be something they'd want to do, bypass the bidding system and have to see what's left to pull from. Would that be an advantage? Would there be other employees who would find that desirable and why? Absolutely. And the reason goes back to the first round. Is that everybody is locked in or locked in is too strong a word, but is assigned a presumptive schedule and you can modify it in open time and maybe ultimately you can drop all of the hours that you were originally assigned for. But it needs to be a piece by piece process and by skipping the bidding process in the first instance and just jumping to the second, you've just got much more flexibility than anybody else in the system to build the own schedule. And that additional flexibility is a benefit for employees because they do not have that same benefit. If you still have to build 60 hours though, why do you have such flexibility? I mean, wouldn't it be difficult to do that? Not necessarily. Some of the flights that are discarded in open time could be, you know, excellent flights, however we're characterizing them. We don't know, sitting here alone, we can't substitute our judgment for the neutral system that had been collectively bargained for and agreed to. If it's okay with your honors, I'd like to move on to the GO because we've only got five minutes left. And I would submit that this is also facially an unreasonable accommodation for Ms. Brigham to be assigned to a position that did not exist, which is what really the situation is here. There was a reference to light duty in the CBA. There is no record evidence that any flight attendant, regardless of if they had on-the-job injuries or not, was ever actually given this as an accommodation, but to Judge McHugh's point, it's very important that this was only available in the first instance to employees who suffered on-the-job injuries. For reassignment to be a valid option, first of all it needs to be the accommodation of last resort, and it needs to be something that is a vacant position. That is what the record is talking about, and these were not vacant positions. The record shows that there was what was contemplated at least was that people who were returning from an on-the-job injury could temporarily just help out in the GO, but it's not like they were working in a receptionist position or any specific position at all. We actually encouraged, we being Frontier, Ms. Brigham to apply or look into or let us know what open positions there were that she was qualified for, and she said in her testimony that none existed. That is dispositive of the entire issue. She said because she needs to identify a open position that is vacant, and she hasn't done so. Is the vacancy or non-vacancy of the position a question of law or fact? That's a question of law because it is her burden to identify a position that was vacant that she was qualified for that she could have gone out for and gotten. And all of the cases that are cited in plaintiff's briefs for that point involve that fact pattern, where there is undisputed that there is a whole department of light-duty positions that certain employees were able to go to, but the plaintiff in those cases was not able to go to. Well, just plain devil's advocate, isn't the term vacancy but inherently ambiguous? I think that it was defined very clearly by the court in Duval to mean it is available for a similarly situated, non-disabled employee to apply for and obtain. Now, it was not available in this instance for similarly situated employees because it was only available for people who had the job injuries. And I'd refer the court on this point to a Tenth Circuit case, which is not cited in the papers, so I want to read the citation, which is Fryer v. Coyle Tubing Services, 415 Federal Appendix 37. In this case, this court affirms summary judgment on a failure to accommodate claim where the employer only gave light-duty assignments if the injury was work-related, unlike plaintiff's situation. That's exactly what the situation is here. And I'd also like to refer the court, because I think this is very important and I want to get it in, to a second case, which was cited to in our summary judgment papers, which is a Seventh Circuit case called Severson v. Hartland Woodcraft Incorporated. And the reason that's important is because it's the only case that I've found that had a light-duty option similar to the one at issue here, where there wasn't light-duty positions that were held open that a plaintiff identified and said they were not allowed to apply for. This was a case much more similar to the one at issue here, where Hartland retained the option in its discretion to give occupationally injured employees temporary duties on an ad hoc basis if such work were available. These temporary light-duty assignments were infrequent, and they were essentially acts of grace, and the court concluded that there was no evidence that Hartland had a policy of creating light-duty positions for employees injured on the job. That's exactly what Frontier was doing. They allowed people who were injured on the job to help out of the general office, but there was no vacant position to which Ms. Brigham could have been assigned to. She has identified no positions that she could have worked at, and in fact, Frontier suggested, hey, we have a new base opening in Orlando. There's going to be a ton of open positions here, and I'm sure that you'll be qualified for some of them. You're free to let us know which one you want to do, and she said, I don't want to move. I see my time is up. Can I just finish my thought? Sure. She said, I don't want to move, and this court, I believe in Mason v. Zavia, said that that alone is unreasonable, said that an employee who limited reassignment options within an organization to their home city was herself acting unreasonable. So, I think the record is clear that we considered reassignment. She has not identified a vacant position that she was qualified, and that was available to her, and so her proposed accommodations were just not reasonable. Thank you, Your Honor. Okay, thank you very much. By the way, within five days, would you submit a 28J letter with that citation that you just gave us for the unpublished opinion in 415, that appendix? Absolutely. Thank you, Your Honor. Don't give us any argument. Just give us that cite. Just the cite. Just the cite, man. Okay. Mr. Crone? Thank you, Your Honor. I think that the critical distinction is that in organizations where an employee is attempting to identify a vacant position to which they could transfer, so the position has to be vacant, they need to be qualified, and then the employer gets to determine whether or not that would pose any sort of undue burden. With regard to OJI programs, or on-the-job injury programs, the analysis is necessarily a bit different, because the OJI program is necessarily created for employees that are injured on the job. But it doesn't change the fact that the court should still ask, is there a vacancy? And in this situation, would the CBA otherwise prohibit the transfer? And here, the answer is that the position was vacant, and the CBA contains no prohibition on the transfer. Therefore, Frontier was free to comply with its obligations on the ADA. Thank you. Thank you. You are out of time, and I hate to do this to you, but I have a question that I'm not going to have another chance to ask you, so I'm going to ask it to you now, and to the extent you can, keep your answer as brief as possible. I did not understand in Ms. Prince's declaration in paragraph 6 how what the union was proposing was any different than what Frontier was proposing, saying that she could bid with, she could express her preference for the preferred flight within the bidding system. Well, that's exactly what he proposed. That's what the process was. So I didn't understand in her declaration how what the union had been proposing was any different than what Frontier had already provided to her. So Frontier didn't provide anything. So Frontier didn't actually propose an accommodation and say, look, you can just go ahead and drop off. Right. Okay. How was what she was proposing any different than the status quo? Ms. Prince, that is. Right. Yeah, so I think Ms. Prince was trying to get at the issue of how to build a schedule without violating the seniority system, but outside of the strict procedure outlined under the CBA. Okay. Thank you. Okay. Thank you. This matter will be submitted. Well done. Counsel for both parties, you're excused.